**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

|  |  |
|---|---|
| MICHAEL S. BROWETT, ) ) Plaintiff, ) ) vs. ) ) CITY OF RENO, ) ) Defendant. ) | 3:16-cv-00181-RCJ-WGC **ORDER** |

This case arises out the denial of a police Sergeant's rights under the Family and Medical Leave Act of 1993 ("FMLA") and the police department's refusal to promote him to Lieutenant after he complained. Pending before the Court are motions for judgment and attorney's fees.

**I.  PROCEDURAL HISTORY**

Plaintiff Michael Browett sued the City of Reno ("the City") in this Court under the FMLA. The Court interpreted the Complaint as including two claims: (1) interference (exercise of rights) under 29 U.S.C. § 2615(a)(1); and (2) interference (discrimination) under 29 U.S.C. § 2615(a)(2).[1] The Court denied summary judgment to the City, and a jury found for Plaintiff on both claims.

---

1 There are three species of anti-retaliation claims under the FMLA. *See* 29 U.S.C. § 2615. First, if an employer retaliates against an employee for using or attempting to use FMLA leave, the claim constitutes "interference with rights" under § 2615(a)(1) ("exercise of rights"). *Bachelder*

## II. DISCUSSION

### A. Damages

#### 1. Back Pay and Benefits

The FMLA provides for past lost pay and benefits ("back pay") as compensatory damages to be awarded by a jury. 29 U.S.C. § 2617(a)(1)(A)(i)(I).[2] The jury awarded Plaintiff $110,406 in back pay. Defendant argues that the award of back pay was based on speculation unsupported by the evidence, but that is not true. The award was supported by an expert witness's unrebutted testimony. Anyway, such an argument is misplaced at this juncture. Defendant may challenge the sufficiency of the evidence via a motion for new trial and/or a renewed motion for directed verdict after judgment is entered. But there is no basis to challenge the amount of back pay awarded by the jury with respect to the form of judgment.

#### 2. Pre-Judgment Interest

The FMLA provides for pre-judgment interest, to be applied to back pay "at the prevailing rate." *Id.* § 2617(a)(1)(A)(ii) (citing *id.* § 2617(a)(1)(A)(i)). In federal question cases, a trial court should apply the rate for post-judgment interest under 28 U.S.C. § 1961(a), "unless the trial judge finds, on substantial evidence, that the equities of the particular case require a different rate." *W. Pac. Fisheries, Inc. v. SS President Grant*, 730 F.2d 1280, 1289 (9th Cir.

---

*v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1124 (9th Cir. 2001). Plaintiff brought no such claim. Second, if an employer retaliates against an employee for opposing a practice made unlawful under the FMLA, the claim constitutes "interference with rights" under § 2615(a)(2) ("discrimination"). Plaintiff's second claim falls under this provision because he was denied a promotion for complaining to the City about its FMLA practices. Third, if an employer retaliates against an employee for instituting or participating in FMLA proceedings, the claim constitutes "interference with proceedings or inquiries" under § 2615(b). Plaintiff brought no such claim.

2 Nominal and punitive damages are not available under the FMLA. *Farrell v. Tri-County Metro. Transp. Dist. of Or.*, 530 F.3d 1023, 1025 (9th Cir. 2008).

1984) (Kennedy, J., joining).  The current § 1961 rate was about 2.24% at the time of the hearing, *see* Selected Interest Rates (Daily) - H.15, https://www.federalreserve.gov/releases/h15/, and although it may change slightly by the time the Court enters judgment, the Court will not recalculate the de minimis difference.  Interest under § 1961 is compounded annually. 28 U.S.C. § 1961(b).

The § 1961 rate is unfortunately often ill-suited to calculate pre-judgment interest in a way sufficient to fully compensate a plaintiff for the lost time value of a damages award.  Where pre-judgment interest is fixed by statute, that ends the matter, but where a Court must use its discretion to determine what rate of interest will make a plaintiff whole, the Court must use its discretion to determine whether the § 1961 rate or some other rate is appropriate to the equities of the case.  As a practical matter, "the weekly average 1-year constant maturity Treasury yield," 28 U.S.C. § 1961(a), does not necessarily represent an accurate calculation of the time value of money to a plaintiff.  The consumer price index ("CPI"), for example, will often be a better benchmark, because it is specifically designed to account for the changing value of U.S. currency with respect to typical consumer expenses such as food, shelter, energy, etc.  The Bureau of Labor Statistics indicates the following "12-month percentage change[s], Consumer Price Index, selected categories, not seasonally adjusted": July 2016 (0.8%), July 2017 (1.7%), February 2018 (2.2%). *See* https://www.bls.gov/charts/consumer-price-index/consumer-price-index-by-category-line-chart.htm.  Because of the low rate of inflation under the CPI in this case, the § 1961 rate is sufficient for pre-judgment interest, and the Court will compound interest annually for each year of wages lost, as § 1961 requires. *See, e.g.*, *Murphy v. City of Elko*, 976 F. Supp. 2d

1359, 1364 (D. Nev. 1997) (Reed, J.) (using the § 1961 rate for pre-judgment interest in a § 1983 case and compounding annually).[3]

Plaintiff suggests[4] using rates "obtained from the Internal Revenue Service website and identified as the schedule for Calculation of Back Wages," i.e., 3.00% through March 31, 2016 and 4.00% thereafter. Plaintiff does not identify the precise source of these figures. They appear to be based on rates used by the Social Security Administration ("SSA") to calculate old age benefits based on awards of back pay, but the Court will not guess. In any case, the rates are not reasonable given the much lower CPI during the relevant time. Also, Plaintiff's interest calculations are unclear as to the method used. (*See* Interest Rate Calculations, ECF No. 69-2). Plaintiff used $110,000 as the principal and listed "Simple Interest" (presumably meaning uncompounded) for each quarter dated July 1, 2015 through April 1, 2018. But there is no indication how Plaintiff obtained the results given. He has not "shown his work." For example, one entry is "7/1/16 4.00% $1,106.01." Using a basis of $110,000, the amount of back pay for the quarter beginning (or ending—the exhibit does not explain which) July 1, 2016, assuming a

---

3 There are also mathematical difficulties with using a fixed rate for pre-judgment interest, and this is an issue no matter what source is used to set the rate. First, judgment is not typically entered until several years after an injury is felt. In the meantime, interest rates can fluctuate meaningfully. Second, one is not made whole by applying a single annual interest rate to an amount lost several years earlier. One must compound (periodically reapply) interest annually (or monthly, daily, etc., as appropriate) to the principal and already-accrued interest in order to accurately calculate the present value of the prior injury. Third, in cases where the injury is not felt at a discrete time but accumulates over time, as with back pay, one must compound interest for the appropriate lengths of time to the appropriate fractions of the award. That is, interest on three years' of back pay should not be compounded for three years' time as to the entire award, otherwise a Plaintiff will be overcompensated by receiving three years' of interest on portions of back pay that have only gone unpaid for one or two years. Finally, mathematical fastidiousness must be weighed against judicial efficiency. A trial court has discretion to do "rough justice" rather than become a "green-eyeshade accountant." *Fox v. Vice*, 563 U.S. 826, 836 (2011).

4 Defendant does not address interest.

steady rate of back pay throughout the two years and seven months of back pay awarded (the exhibit nowhere states or implies this is not so) is 3/31 x $110,000 = $10,645.16. Four percent of that is $425.81, not $1,106.01. Four percent of the fifteen months of lost back pay through July 1, 2016 is $2,129.03, so that can't be the formula used, either. If 1% quarterly interest (corresponding to constant 4% annual interest) is applied to $10,645.16 and compounded quarterly for nine more quarters, the result is $1,113.72. That's close to Plaintiff's result of $1,106.01. But even counting July 1, 2016 itself, there are only seven-and-a-half quarters between that date and February 2018 (the date used to calculate back pay at trial), so this cannot be the basis of Plaintiff's calculation. Furthermore, there is no indication that the IRS or the SSA compound interest rates quarterly, and Plaintiff has listed the interest as "Simple." There may be a valid basis for the calculation, but Plaintiff has not provided it, the Court is unable to divine it, and the rates used are significantly higher than the § 1961 rate, which is itself higher than the CPI.

Plaintiff is owed back pay from July 21, 2015 to February 21, 2018 (exactly 31 months), according to the expert report relied upon by the jury. The annual rate is 2.24%. The accrual for the last seven months from July 21, 2017 to February 21, 2018 at the annual rate is 2.24% x 7/12 = 1.31%. For the first year of back pay (July 21, 2015 to July 21, 2016), the interest accruing from July 21, 2016 through February 21, 2018 is $110,406 (12/31) x 1.0224 x 1.0131 - $110,406 (12/31) = $1,529.73. For the second year of back pay (July 21, 2016 to July 21, 2017), the interest accruing from July 21, 2017 through February 21, 2018 is $110,406 (12/31) x 0.0131 = $559.87. The last seven months of back pay accrued interest for an average of 3.5 months. The

accrual over 3.5 months at the annual rate of 2.24% is 0.65%.[5]  Therefore, these final seven months of back pay accrued interest through February 21, 2018 equal to $110,406 (7/31) x 0.0065 = $162.05.  The total pre-judgment interest is $2,251.65.

### 3. Liquidated Damages

Finally, "an additional amount as liquidated damages equal to the sum of the amount described in clause (i) [back pay] and the interest described in clause (ii)" must also be awarded. *Id.* § 2617(a)(1)(A)(iii).  Liquidated damages are awarded by default, but the Court has discretion not to award them if the City "proves to the satisfaction of the court that the act or omission which violated section 2615 of this title was in good faith and that the employer had reasonable grounds for believing that the act or omission was not a violation of section 2615 of this title." *Id.* § 2617(a)(1)(A)(iii).  The City has not made a showing of good faith, at least not as to the § 2615(a)(2) claim.  The evidence adduced at trial made clear that Plaintiff's complaint to the City about his FMLA right to substitute sick leave was not only a reason, but the primary reason, for the decision not to promote him.  Plaintiff's complaint about the City's FMLA practice was aggressively brought up directly in the promotion interviews and later explained to Plaintiff as the reason for his denial of promotion.

The Court rejects the argument that the City's actions were reasonable because of the manner in which Plaintiff complained about the FMLA issue.  The May 11, 2015 email Plaintiff sent to the City's human resources representative complaining about the City's denial of permission for him to use sick leave and the City's requests for medical details (that may have

---

5 Because § 1961(b) requires annual compounding, the Court will not divide 2.24% by twelve and separately compound interest on each of these final seven months monthly.

been in violation of the Collective Bargaining Agreement) included no profanity, misrepresentations, or improper threats. It was only "threatening" in the sense that Plaintiff threatened to file a grievance if the City persisted in denying him the right to use his sick leave and insisting he take unpaid or vacation leave.[6] At trial, counsel and witnesses for the defense focused on the word "threat," as if there had been some threat of violence or other improper action in the email, but no reasonable person could have found the evidence to show that. A threat to file a grievance about an unlawful practice is categorically protected behavior, and the "threat" in this case did not go beyond that. Most of the other evidence used to support the City's alleged good faith in denying Plaintiff a promotion occurred after the first denial of promotion and was in fact precipitated by it, i.e., Plaintiff's "outbursts" in frustration with certain command staff members having retaliated against him in the promotion process because of his earlier complaints about sick leave. Nearly all of the evidence relating to any "anger

---

6 Unless the CBA required it, Plaintiff was not correct that he had the right under the FMLA to demand twelve weeks of unpaid leave consecutive to his paid sick leave once the latter was exhausted. The City had the right to count Plaintiff's paid sick leave against his twelve-week entitlement under the FMLA. But the City did not merely insist on that. Rather, the City presumed that Plaintiff wanted to take leave to "bond with his baby" and insisted that he therefore either take unpaid leave or vacation leave. That was a violation of Plaintiff's FMLA rights—and the jury so found—because Plaintiff had the right to use his accrued, paid sick leave to care for his wife while she had a serious health condition. (It was also potentially a Title VII violation, because evidence at trial indicated that the City treats male and female employees differently with respect to the use of sick leave to bond with newborns, but no Title VII claim was brought in this case.) Although Plaintiff was wrong that the City could not run his sick leave concurrently with his 12-week FMLA entitlement, he was right that he was entitled to use sick leave. The law is clear that the duty to properly identify the nature of the leave and the employee's rights under the FMLA rested with the City, not with Plaintiff. The evidence adduced at trial was sufficient for the jury to find that the City already knew the qualifying reason for Plaintiff's sick leave use under the FMLA when the human resources representative told him he would have to use unpaid or vacation leave.

management and communication problems" cited by the City relates to Plaintiff's conflict with the City over his sick leave. (*See* Resp. 2–3, ECF No. 72).

As in *Liu*, where the reason given for the adverse action was problems with "soft skills" such as "being upbeat," the reasons given for passing over Plaintiff that were unrelated to Plaintiff's frustration with the sick leave issue were similarly vague and intangible, such as "lack of command presence," "lack of global view of the Department and City," "very limited strategic perspective," and "did not adequately answer some questions." *See Liu v. Amway Corp.*, 347 F.3d 1125, 1136–37 (9th Cir. 2003) ("Where termination decisions rely on subjective evaluations, careful analysis of possible impermissible motivations is warranted because such evaluations are particularly susceptible of abuse and more likely to mask pretext." (citation and internal quotation marks omitted)). Of the potentially concrete reasons given, such as "lack of understanding as to how a lieutenant fits into the strategic structure of the department," no witness gave concrete examples or explanations but only unsupported conclusions. Defendants' witnesses' testimony mirrored the June 11, 2015 pass over letter, which was similarly vague and conclusory, (*see* Letter, ECF No. 18-11), as noted in the Court's order denying summary judgment, and it does not overcome the "smoking gun" evidence of unlawful motivation admitted by Defendants' own witnesses. Concrete reasons, either in the pass over letter or at trial (where witnesses had a full opportunity to explain themselves beyond what was stated in the letter) might be something like:

> Sergeant Browett lacked a global view of the department and didn't display an understanding of how a Lieutenant is expected to further the strategic goals of the department. For example, Sergeant Browett was unaware of the geographic and functional jurisdictional boundaries between the Reno Police Department, the Sparks Police Department, the Washoe County Sheriff Department, and the Nevada Highway Patrol. Although a Sergeant only requires a cursory understanding of these issues, a Lieutenant must master them, because Lieutenants determine whether and how many units respond to incidents implicating overlapping

> jurisdiction and are primarily responsible for liaison with other law enforcement organizations. Sergeant Browett also indicated a poor approach to being a second-level supervisor. Although his file indicates good direct supervisory skills, when asked how he would help a team of Sergeants to supervise their own teams of Officers, he responded that he would address issues on a case-by-case basis whenever a Sergeant asked him for help supervising an Officer. That approach is too myopic for a Lieutenant, who should develop his Sergeants' leadership skills by establishing leadership policies and giving routine leadership guidance in order to minimize his having to react to leadership failures of Sergeants as they occur. Finally, Sergeant Browett was unable to identify the stated goals of any of the current three RPD community policing initiatives. These goals have been extensively disseminated throughout RPD, including in training sessions that all sworn officers, including Sergeant Browett, have had to attend. A Lieutenant must have these goals in mind when giving his Sergeants direction. It is at the Lieutenant rank in particular where RPD's strategic goals are translated into concrete standards and guidelines for Sergeants and Officers in the field. Sergeant Browett was completely unaware of this critical strategic function of a Lieutenant.

The Court has of course fabricated the details of a Lieutenant's role within RPD and Sergeant Browett's putative lack of knowledge about those details for the purpose of illustration, but the command staff of course knows what those details are, and the explanations given in the pass over letter and at trial do not indicate any comparison of Plaintiff's interview answers to concrete standards of knowledge or skill for an RPD Lieutenant, or even what questions were asked, what a good answer would entail, or what Sergeant Browett's answers were. The first sentence of the above passage alone is conclusory. But that is all the pass over letter and the witnesses at trial said. Nothing resembling a concrete explanation like that given in the remainder of the example passage above was given in the pass over letter or at trial. When pressed to explain at trial, the witnesses simply repeated the conclusions listed in the pass over letter, which may even indicate that the witnesses had no independent, substantive memory of Sergeant Browett's interview answers beyond a recent review of the pass over letter itself.

By contrast, the evidence of Plaintiff's merit was concrete. Not only was he the valedictorian of his class at the police academy and first on the Lieutenant's promotion list (tied

for first after non-merit seniority points were applied), he had successfully performed at least some operational duties of a Lieutenant in the field for a period of time. The Lieutenants to have directly supervised Plaintiff as a Sergeant supported his promotion to Lieutenant when asked by the command staff, even though the very fact they were asked at all was abnormal. Plaintiff had no internal affairs investigations in his file. Ideally, that would be true of all officers. Unfortunately, it is not. The evidence showed that another Sergeant had had an internal affairs charge sustained after an investigation, but the Acting Chief had not taken action against that Sergeant, in apparent violation of policy, perhaps because it would have taken the Sergeant out of consideration for Lieutenant. At least one member of the command staff had himself been subject to an internal affairs investigation and had even had a charge sustained but was not demoted or otherwise disciplined beyond a verbal warning. Plaintiff had never had a single citizen complaint against him, much less an internal affairs charge. He had once been voted Sergeant of the Bid by his fellow sergeants.[7] He had received commendations for actions in the field and had always been rated as meeting or exceeding standards in every area of evaluation.

This is not to say that those Sergeants selected for promotion to Lieutenant over Plaintiff did not have accolades in their files. We simply have no idea if that is the case, because the City presented no evidence of those candidates' merits, demerits, or interview answers. Rather, the City chose to concentrate its evidence on Sergeant Browett's alleged demerits (most of which were related to his protected activity) and conclusory criticisms of his interview answers. But in the context of a competitive promotion process where a fixed number of candidates will be promoted, evidence of a single candidate's performance is insufficient to show that that

---

7 A "bid" is a six-month period.

candidate should not have been promoted. If it had been the case that any and all candidates performing to a certain standard were to be promoted, a focus on Sergeant Browett's record and interview performance alone might be sufficient to show good faith as to a decision not to promote him. Under such a regime, other candidates' merits, demerits, and interview performances would be irrelevant. But the promotion process here was a competition between candidates for a fixed number of Lieutenant positions, requiring a comparison of the candidates' relative merits, demerits, and interview performances. In the face of the overwhelming, "smoking gun"-type evidence that Plaintiff's complaints about his sick leave were the reason he was not promoted, any reasonable jury would have had an incredibly difficult time finding no liability without seeing evidence that the other candidates' merits outweighed their demerits to a greater extent than was true for Plaintiff and/or that the other candidates' interview answers were better than Plaintiff's. The City adduced no evidence that could have assisted the jury in conducting such an analysis. Likewise, now, the absence of that kind of evidence makes it impossible for the Court to find for the purposes of liquidated damages that the promotion decisions were made in good faith with respect to Plaintiff's FMLA rights.

Finally, little need be said about the fact that one of the three Sergeants promoted to Lieutenant instead of Plaintiff in June 2015 was the brother of promotion board member Deputy Chief Robinson.[8] And it was Deputy Chief Robinson who most aggressively opposed Plaintiff's

---

8 It is unclear whether Plaintiff or any of the other Sergeants not selected for promotion to Lieutenant in June 2015 filed a complaint with the Nevada Commission on Ethics based on Deputy Chief Robinson's participation in the promotion panel when his brother was one of the candidates. *See* Nev. Rev. Stat. §§ 281.210, 281A.065, 281A.400, 281A.420.

promotion based on his complaint to the City about the sick leave issue and who prepared the pass over letter for Acting Chief Soto to sign.

Given the significant, unrebutted evidence of unlawful retaliation, the lack of adverse employment actions against others (including a member of the command staff) who had been found to have committed acts punishable by measures much harsher than the bare denial of further promotion, Plaintiff's exemplary personnel file, and the lack of evidence of the comparative merits, demerits, and interview answers of the other candidates or even any concrete criticism of Plaintiff's interview answers, the notion that Plaintiff's denial of a promotion was supported by his performance or attitude unrelated to his conflict with the City arising out of the sick leave issue seems highly implausible. The City has not shown that it acted in subjective good faith or with an objectively reasonable belief that its acts were not a violation of the statute. The Court therefore awards liquidated damages of $112,657.65.

### B. Equitable Relief

The FMLA also provides for "such equitable relief as may be appropriate, including employment, reinstatement, and promotion." *Id.* § 2617(a)(1)(B). Although promotion is the preferred remedy, if not feasible, "front pay" is available as an equitable substitute. *Traxler v. Multnomah Cnty.*, 596 F.3d 1007, 1011–12 (9th Cir. 2010); *Thorne v. City of El Segundo*, 802 F.2d 1131, 1136 (9th Cir. 1986) ("Awards of front pay are appropriate when it is impossible to reinstate the plaintiff or when it would be inappropriate due to excessive hostility or antagonism between the parties."). At trial, Plaintiff adduced unrebutted expert testimony on both back pay and front pay.[9] The jury suggested $900,468 in front pay, but it is the duty of the Court to

---

9 The Court agrees that an order to promote Plaintiff would be impractical in this case. The City would have to either create a new Lieutenant position or demote a sitting Lieutenant to

independently determine the appropriate amount. "Front pay can only be calculated through intelligent guesswork, and we recognize its speculative character by according wide latitude in its determination to the district courts." *Id.* at 1011 (quoting *Downey v. Strain*, 510 F.3d 534, 544 (5th Cir. 2007)). "Judicial discretion in at the heart" of an award of front pay, and a court must craft the remedy to fit the "infinite variety of factual circumstances." *Traxler*, 596 F.3d at 1012–13 (quoting *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)). Although the jury's suggestion of the amount of front pay is not binding, a court is permitted to obtain a jury's advice on the question. *Id.* at 1013 (citing *Lutz v. Glendale Union High Sch.*, 403 F.3d 1061, 1069 (9th Cir. 2005); *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 78 n.1 (3d Cir. 2009)) ("A trial court, sitting in equity, may nevertheless employ an advisory jury. The ultimate decision, however, rests with the court.").

The jury's suggestion of $900,468 reflects one of Plaintiff's expert's calculations, i.e., the calculation that assumes: (1) further promotion to Commander after five years as a Lieutenant; (2) no further promotion to Deputy Chief, Assistant Chief, or Chief; and (3) retirement after 25 total years of service. The Court finds that Plaintiff would pass any future promotion exam. A contrary assessment would be unreasonable given Plaintiff's top score on the previous promotion exam. And there is no basis to question the expert evidence as to calculations of amounts based on the various assumptions of promotion and retirement dates as stated in the expert report. Defendant made no such challenge at trial and offered no contrary evidence.

---

accommodate Plaintiff. Also, there is animosity between Plaintiff and one or more members of the current RPD command staff. Although there is already some tension on the RPD command staff for various reasons that became apparent at trial, ordering Plaintiff's promotion would exacerbate it. And because the command efficacy of RPD affects public order and safety for over 200,000 people, an order of promotion would be imprudent, not only impractical.

The Court finds in its discretion that a 25-year career at RPD is a fair estimate, at the midpoint between 20 and 30 years. A relatively early retirement after 20 years seems unlikely for Plaintiff, who was shown to be a dedicated, driven officer with a desire to advance his career, especially where the testimony at trial showed that the average time was just over 24 years. At the same time, the Court must temper its assessment of front pay to avoid a potential windfall. *See Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1157 (9th Cir. 1999) (citing *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1424 (4th Cir. 1991)). The Court will therefore not presume a 30-year career, although it is certainly possible Plaintiff would have worked that long had the unlawful acts giving rise to this lawsuit not occurred. Next, given the evidence of Plaintiff's past performance, assuming in equity that future promotion panels would be fair and unbiased, and considering that two retired RPD Commanders testified that they believed Plaintiff could have reached the rank of Commander and performed well at that rank, the assumption that Plaintiff would be promoted to Commander after five years as a Lieutenant and thereafter not be further promoted actually appears somewhat modest, but this is also in accordance with the temperance with which front pay must be awarded. The Court finds that Plaintiff proved all the relevant supporting facts at trial, i.e., the amount of lost front pay under various assumptions of further promotion and longevity, the likelihood of future promotion based on past performance, and the likelihood of longevity. The Court finds in its discretion that $900,468 is a reasonable, temperate estimation of front pay.

Plaintiff asks the Court to double the award of front pay, as well, but the Court may not do this. The statutory liquidated damages provision explicitly refers to § 2617(a)(1)(A)(i) (back pay) and (ii) (interest), not to § 2617(a)(1)(B) (equitable remedies), and front pay is an equitable remedy under § 2617(a)(1)(B). *Traxler*, 596 F.3d at 1011–12. Nor may the Court, as Plaintiff

suggests, award liquidated damages in equity under § 2617(a)(1)(B). The purpose of the equitable remedy is to make a plaintiff whole, i.e., to put him in the position he would be in had there been no violation. That is why the preferred remedies are the direct ones listed therein, "employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B). Front pay is a "substitute" for promotion, *Traxler*, 596 F.3d at 1011, not a bonus or penalty. To award double front pay would be the equivalent of awarding both promotion *and* front pay. Because either alone would make Plaintiff whole, awarding both would serve no purpose but punishment, and one cannot recover exemplary or punitive damages under the FMLA in particular, *Farrell*, 530 F.3d at 1025, or in equity generally, *United States v. Bernard*, 202 F. 728, 732 (9th Cir. 1913) ("[T]he function of a court of equity goes no farther than to award as incidental to other relief, or in lieu thereof, compensatory damages. It has no authority to assess exemplary damages."); *see also Shore v. Fed. Express Corp.*, 777 F.2d 1155, 1159–60 (6th Cir. 1985) (front pay as an equitable remedy under Title VII) ("The front pay award is limited to the amount required to place the plaintiff in the position she would have occupied in the absence of the discrimination.").

    Next, Defendant argues that because Plaintiff has not demanded promotion as a remedy, he should not receive front pay at all, because front pay is a substitute for promotion. In other words, one cannot receive a remedy that is available only as a substitute for another remedy that one has not demanded. The Court rejects that argument in this case, however, even assuming for the sake of argument that the theory is correct. Plaintiff explicitly prayed for "equitable relief as may be appropriate [under] 29 U.S.C. § 2617(a)(1)(B)" in the Complaint, (Compl. 8:12), and the cited statute explicitly includes "promotion" as an available remedy, 29 U.S.C. § 2617(a)(1)(B). Plaintiff cannot be faulted for having also provided expert evidence at trial supporting the

alternative, substitute remedy of front pay in anticipation that the Court might find a direct promotion to be infeasible in this case. There is nothing in the record indicating that Plaintiff would not accept a promotion to Lieutenant if offered. His testimony was not that he did not desire to be promoted to Lieutenant, but that he did not believe he would ever be promoted to Lieutenant at RPD given the animosity between him and some members of the command staff. But Plaintiff prayed for all appropriate equitable relief, which includes direct promotion. The Court has found that an order of promotion is not feasible in this case due to concerns of funding, public safety, displacement of other employees, and ongoing animosity. It therefore awards the equitable substitute of front pay.

Finally, the Court will direct RPD to take measures to ensure Plaintiff's protected activity is not used as the basis for any further adverse employment actions. That is, Plaintiff's complaint to the City about his sick leave and other events precipitated by it, such as Plaintiff's later complaints about the issue having been used against him at interviews, Plaintiff's complaints about the issue to supervisors, the present lawsuit, etc., may not be considered in any future employment actions. The City must take whatever measures are necessary to ensure future compliance, including removing any relevant information from Plaintiff's files.

### C.     Attorney's Fees, Expert Fees, and Costs

The Court must "allow a reasonable attorney's fee, reasonable expert witness fees, and other costs of the action to be paid by the defendant." 29 U.S.C. § 2617(a)(3). Plaintiff requests $261,380 in attorney's fees and $14,550 in expert witness fees. Counsel has billed 560.4 hours at $450 per hour for his labor and 73.60 hours at $125 per hour for his legal assistant's labor, and Dr. Coleman has billed 44.5 hours for his expert work at $300 per hour and three hours for his testimony at $400 per hour. Counsel has also submitted a bill of costs to the Clerk.

The Court finds the claimed rates to be reasonable for the local market given counsel's 25 years of litigation experience. Defendant objects to the rate of $450 per hour for attorney labor and $125 per hour for paralegal labor because the rates are only supported by counsel's own affidavit. The Court rejects this objection. The Court takes judicial notice of recent awards in this District, including those referred to by counsel at oral argument, and finds the rates to be reasonable for a 25-year litigator. *See, e.g.*, *CLM Partners LLC v. Fiesta Palms, LLC*, No. 2:11-cv-1387, 2013 WL 6388760, at *5–6 (D. Nev. Dec. 5, 2013) (Hoffman, Mag. J.) (collecting cases). To the extent $450 per hour is at the upper end of the rates previously awarded, the Court finds that counsel's expertise, skill, and the results obtained in this case support a rate at the upper end. Overall, the hours claimed are also reasonable—the Court addresses Defendant's particular objections, *infra*. Counsel has submitted the required itemizations and affidavit.

Defendant next objects to 24.30 hours ($10,935.00) of attorney labor billed between July 12, 2017 and December 21, 2017 related to worker's compensation, job stress, and fitness-for-duty issues not related to the FMLA claims. The Court sustains this objection. Defendant also objects to the 73.60 hours ($9,200) of paralegal labor billed for "secretarial tasks such as organizing files, document preparation and sitting in the courtroom during trial." The Court rejects this objection. This is normal, reasonable paralegal labor related to the case.

Finally, Defendant objects to the expert witness fees because the letter from Mr. Coleman to counsel does not itemize his 44.5 hours of labor. The Court rejects this objection. Mr. Coleman explained the nature of his work at trial, which consisted of making calculations of lost pay and benefits given the relevant assumptions provided by counsel.

In summary, the Court awards $250,445.00 in attorney's fees and $14,550.00 in expert witness fees, for a total of $264,995.00.

**D.  Post-Judgment Interest.**

Post-judgment interest under 28 U.S.C. § 1961 shall run at the daily rate of 1/365th of 2.24%, applied to the total award of $1,390,778.30.[10]  Post-judgment interest comes to $85.35 per day.

## CONCLUSION

IT IS HEREBY ORDERED that the Motion for Leave to File Motion for Entry of Judgment (ECF No. 69) is GRANTED, and the Motion for Entry of Judgment (ECF No. 69-1) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the Renewed Motion to Quash (ECF No. 67) is GRANTED.  Plaintiff obtained a verdict on the relevant claim(s) without the subpoenaed information, and the subpoenaed information is not relevant to damages, fees, or costs.

IT IS FURTHER ORDERED that the Motion for Attorney's Fees (ECF No. 70) is GRANTED IN PART and DENIED IN PART.

IT IS FURTHER ORDERED that the Clerk shall enter judgment in favor of Michael Browett and against the City of Reno, as follows: $110,406.00 in back pay; $2,251.65 in pre-judgment interest; $112,657.65 in liquidated damages; $900,468.00 in front pay; $250,445.00 in attorney's fees; $14,550.00 in expert witness fees; and post-judgment interest of $85.35 per day from the date of judgment.

IT IS FURTHER ORDERED that Plaintiff's complaints to the City about his sick leave and other events precipitated by it, such as Plaintiff's later complaints about the issue having been used against him at interviews, Plaintiff's complaints about the issue to supervisors, the

---

10 Post-judgment interest is applied to awards of fees. *Perkins v. Standard Oil Co.*, 487 F.2d 672, 675 (9th Cir. 1973).

present lawsuit, etc., may not be considered in any future employment actions. The City must take whatever measures are necessary to ensure future compliance, including removing any relevant information from Plaintiff's files.

IT IS SO ORDERED.

Dated this 8th day of May, 2018.

_____
ROBERT C. JONES
United States District Judge